# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

№ 21-CV-6234 (RER)

———————————

## ST. JOHN

VERSUS

## COMMISSIONER OF SOCIAL SECURITY

———————————

**MEMORANDUM & ORDER**

March 14, 2024

———————————

**RAMÓN E. REYES, JR., U.S.D.J.:**

Plaintiff Contessa St. John ("Plaintiff" or "Claimant"), proceeding pro se, brings this action against the Commissioner of Social Security ("Defendant" or "Commissioner") pursuant to the Social Security Act, 42 U.S.C. § 405(g), seeking review of Defendant's decision that Plaintiff is not entitled to disability insurance benefits. (ECF No. 1). Before the Court is Defendant's Motion for Judgment on the Pleadings (ECF No. 13 ("Def.'s Mot.")), to which Plaintiff opposes (ECF No. 18). After carefully reviewing the record, and for the reasons set forth herein, the Court denies Defendant's Motion, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

## <u>BACKGROUND</u>

I.  <u>Plaintiff's Application for Disability Insurance Benefits</u>

Plaintiff is a thirty-five-year-old woman residing in Brooklyn, New York. (ECF No. 8 ("Admin. Tr.") at 85). She was previously employed as a cashier, a school aide, and a door person at a hotel. (*Id.* at 70–73). On September 12, 2019, Plaintiff filed for disability

insurance benefits, alleging that her disability began on March 7, 2019, when she became unable to work. (*Id.* at 84). Her application stated that she suffered from anxiety, depression, back issues, pinched nerve and scoliosis, and schizophrenic, paranoid, and other functional psychological disorders. (*Id.* at 85–86). Plaintiff's application was denied on December 18, 2019, and, upon reconsideration, again on May 4, 2019. (*Id.* at 84, 97). Subsequently, she requested a hearing in front of an administrative law judge ("ALJ") for reconsideration of the decision. (*Id.* at 126).

II.     The Telephone Hearing & Related Procedure

On August 6, 2020, ALJ Sommattie Ramrup ("the ALJ") held a telephone hearing to reconsider the denial of Plaintiff's benefits. (Admin. Tr. at 38). Plaintiff and Vocational Expert Rabia Rosen ("Ms. Rosen") testified. (*Id.* at 39). After some preliminary questions verifying Plaintiff's basic information, Plaintiff waived her right to an attorney. (*Id.* at 40–44). The ALJ then verified Plaintiff's treating sources, and Plaintiff confirmed that she 1) had previously received mental treatment at Community Counseling and Mediation ("CCM"), 2) was waiting to receive mental treatment at the Ahava Medical Center ("Ahava"), and 3) received treatment for her back, shoulder, and feet at Brooklyn Hospital and New York Methodist Hospital. (*Id.* at 48–50). The ALJ had limited medical records in front of her and focused her questioning on Plaintiff's physical ailments and why she was unable to work. (*Id.* at 50–51, 55). Taking the limited record and Plaintiff's answers into consideration, the ALJ then questioned Ms. Rosen, who has over thirty of experience in the field. (*Id.* at 75, 264–67). Ms. Rosen stated that Plaintiff is incapable of performing her past work, but listed three non-sedentary and three sedentary jobs that Plaintiff could be capable of performing. (*Id.* at 76–77).

After the telephone hearing, the ALJ sought additional medical records. Once the new medical records were received, the ALJ wrote to Plaintiff to let her know that the records were being added to the record and that Plaintiff had a right to request an additional hearing. (*See id.* at 268). Between September 24, 2020, and January 25, 2021, eight letters were sent to Plaintiff to this effect. (*Id.* at 268–73, 276–83, 285–86).

III.    The Medical Record

A.    The Brooklyn Hospital Center & New York Methodist Hospital

Plaintiff visited the Brooklyn Hospital Center multiple times from February 8, 2016, through November 21, 2019. (Admin. Tr. at 297–429, 483–93). The medical records include Plaintiff's general wellness and women's health visits throughout that time. (*Id.*) In November 2017, an MRI and X-Ray noted various spinal and neural complications. (*Id.* at 411). Additionally, Plaintiff underwent two bunion surgeries on December 21, 2017, and February 15, 2018, respectively. (*Id.* at 309, 317). After her casts were removed, Plaintiff was seen again for continued pain and swelling in her left foot. (*Id.* at 350). In June 2018, Plaintiff was seen for recurrent chest pains and referred to a psychiatrist. (*Id.* at 387). The records also indicate that Plaintiff has a history of allergies and/or asthma. (*See id.* at 404). In addition, Plaintiff visited New York Methodist Hospital multiple times between May 11, 2016, and July 19, 2016.[1] (*Id.* at 287–96). There, she received an X-Ray due to pain in her left arm. (*Id.* at 290–91).

---

[1] The Administrative Transcript also reveals that Plaintiff visited New York Methodist Hospital around September 10, 2020, but the Court is unable to discern the general nature of this visit. (Admin. Tr. at 494).

B.     Community Counseling & Mediation ("CCM")

According to the Administrative Transcript, Plaintiff received mental health treatment at CCM from July 25, 2019, through March 6, 2020. (Admin. Tr. at 543–53, 499). Upon intake, Plaintiff "appeared alert, well-groomed, and oriented," but presented with a variety of depressive and anxiety symptoms, such as not wanting to get out of bed, getting stressed by the general population, not wanting to be in public places, experiencing panic attacks brought on by social exposure, and more. (*Id.* at 541, 543). Despite these symptoms, Plaintiff appeared motivated and able to focus, and she denied hallucinations. (*Id.* at 544, 547). Plaintiff was diagnosed with general anxiety disorder, social phobia, and major depressive disorder. (*Id.* at 543). Plaintiff continued psychiatric treatment at CCM with therapist Cynthia Zhang and nurse practitioner Thomas Perron.[2] (*See generally id.* 476–77, 495–560).

Over the course of her treatment, Ms. Zhang and Mr. Perron described Plaintiff as alert, well-oriented, and well-groomed with an ability to focus on the relevant topic and good medication compliance, but they also noted her poor frustration tolerance, irritability, poor time management skills, and how she often felt people were lying to her or taking advantage of her. (*See id.* 496–560) Likewise, throughout the records, there are general notations to Plaintiff's self-reported depressive moods, high levels of anxiety, feelings of being overwhelmed, and panic attacks. (*See, e.g.*, *id.* at 526, 528, 537, 541). The records also indicate that Plaintiff began to express discomfort with working with the psychiatrist at CCM. (*Id.* at 522). In addition, Plaintiff tried various prescription medications while seeking treatment at CCM. (*See id.* at 520). Ultimately, in a Clinician's Report on February

---

[2] It appears that Plaintiff may have also been treated by Angela Massey, but the records are unclear. (*See* Admin. Tr. at 499).

14, 2020, Mr. Perrone stated that Plaintiff's progress was such that he felt she was ready for his educational program. (*Id.* at 476–77).

    C.   <u>Dr. John Miller</u>

    On November 16, 2019, Dr. Miller, a psychologist, consulted with Plaintiff to aid the Commissioner in making a benefits eligibility decision. (Admin. Tr. at 454). Dr. Miller described Plaintiff's 1) depressive episodes, with symptoms including "dysphoric moods, crying spells, hopelessness, irritability, fatigue/loss of energy," and more, with most occurring as recently as a week prior; 2) complaints of anxiety, which included phobic responses to crowds and public transportation, panic attacks that occur once or twice a month and are triggered by subways and other public places; 3) thought disorder symptoms and how she could be experiencing auditory hallucinations; 4) paranoid ideation, which causes her to think that "there is always someone in the hallway who might hurt her and that people are talking about her;" and 5) short-term memory deficits, which cause her to have difficulty concentrating and to forget plans and appointment times. (*Id.* at 455). Although he characterized Plaintiff as having a cooperative demeanor with adequate social skills and good personal hygiene, he described her thought process as paranoid, affect as dysphoric, and mood as dysthymic. (*Id.* at 456). Likewise, while Dr. Miller remarked that Plaintiff's attention and concentration was intact, he also stated that she required instructions to be repeated because of lapses of attention and concentration. (*Id.*). Further, he noted that her cognitive functioning fell below average, her insight was poor, and her judgment was fair. (*Id.* at 456–57). With respect to vocational functional capacities, he stated that Plaintiff's ability to interact adequately with supervisors, coworkers, and the public is markedly limited; her ability to use reason and judgment,

sustain concentration, and regulate emotions is moderately limited; her ability to have an ordinary routine is mildly limited; and there is no limitation on her ability to understand, remember, or apply instructions. (*Id.* at 457).

D.    Dr. Shennan Weiss

On November 19, 2019, Dr. Weiss conducted an internal medicine examination of Plaintiff to aid the Commissioner in deciding her eligibility for benefits. (Admin. Tr. at 460). Plaintiff was previously diagnosed with scoliosis, and in 2015, she fell down a flight of stairs, which caused her to have a concussion, a cervical herniated disc, and a left-sided radiculopathy. (*Id.*). Dr. Weiss found that Plaintiff had a normal gait and stance, was capable of walking without difficulty, and was in no acute distress. (*Id.* at 461). Accordingly, Dr. Weiss found that Plaintiff had no limitations.

E.    Dr. Alejandra Uribe

Plaintiff visited Dr. Uribe on December 31, 2019. (Admin. Tr. at 471). The visit was to follow up on Plaintiff's complaints of pain in her left arm and chronic neck pain that radiates to her lower back. (*Id.*).

F.    Ahava Medical

The Administrative Transcript includes Plaintiff's mental health records at Ahava from September 29, 2020, through January 25, 2021. (Admin. Tr. at 569–600). There, Plaintiff was seen by Dr. Waki Mohammad and therapist Miri Taub, and she was ultimately diagnosed with schizophrenia. (*Id.* at 563–64, 568, 576). Plaintiff was prescribed new medications that corresponded with this diagnosis. (*See id.* at 569). Upon intake, Plaintiff explained that she left CCM because she had an argument with her therapist. (*Id.* at 563). The Ahava records indicate that Plaintiff had paranoid thoughts, fights with people she

6

encountered in public, and auditory hallucinations. (*Id.* 561–604). The treatment records also describe Plaintiff has having guarded behavior, normal speech, anxious mood and affect, adequate concentration, and fair insight and judgment. (*Id.*).

On October 27, 2020, Dr. Mohammad submitted a letter explaining Plaintiff's diagnosis of schizophrenia and how she is unable to work on a sustained basis. (*Id.* at 575). In addition to his own psychiatric assessment, Dr. Mohammad relayed Plaintiff's physical limitations based on an interview with her. (*Id.*). On November 17, 2020, Dr. Mohammad submitted a "Mental Residual Functional Capacity Assessment," opining about Plaintiff's mental health impairments and how they relate to her ability to perform certain job junctions. (*Id.* at 582–85). He rated Plaintiff has having marked or extreme limitations in nearly every category. (*Id.*).

G.     Consulting Physicians' Reviews of the Record

Four doctors reviewed Plaintiff's medical records to aid the ALJ in making her disability determination. First, in December 2019, Dr. E. Gagan, a psychological consultant, and Dr. L. Marasigan, a medical consultant, reviewed the Plaintiff's medical records, but they were unable to review any record from CCM or Ahava because those had yet to become part of the record. (Admin. Tr. at 84–96). Both doctors found Plaintiff not to be disabled. (Admin. Tr. at 95). Subsequently, in April and May 2020, Dr. J. Dambrocia, a psychological consultant, and Dr. V. Au, a medical consultant, reviewed Plaintiff's medical records, but again, they were unable to review treatment records from Ahava. (*Id.* at 97–112). They also determined that Plaintiff was not disabled. (*Id.* at 111).

IV.      The ALJ's Decision

On March 12, 2021, the ALJ issued a decision denying Plaintiff disability insurance benefits and finding that Plaintiff was not disabled. (Admin Tr. at 14–33). As a preliminary matter, the ALJ determined that, based on the evidence submitted, Plaintiff has sufficient insurance coverage through September 30, 2024, to be eligible for disability insurance benefits. (*Id.* at 17).

Next, the ALJ assessed the five steps established by the Social Security Administration to determine whether Plaintiff is disabled under sections 216(i) and 223(d) of the Social Security Act:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe physical or mental impairment, or combination of severe impairments; (3) whether the impairment (or combination) meets or equals the severity of one of the impairments specified in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing of Impairments"); (4) whether, based on an assessment of the claimant's residual functional capacity, the claimant can perform any of her past relevant work; and (5) whether the claimant can make an adjustment to other work given the claimant's residual functional capacity, age, education, and work experience.

*Schillo v. Kijakazi*, 31 F.4th 64, 70 (2d Cir. 2002) (citing 20 C.F.R. § 404.1520(a)(4)(i)– (v)); (Admin. Tr. at 18–19). For the first four steps, a claimant has the burden of proof, but the burden then shifts to the Commissioner at the fifth step. *Schillo*, 31 F.4th at 70.

At the first step, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since March 7, 2019. (Admin. Tr. at 19); *see also* 20 C.F.R. 404.1571. Next, the ALJ found that Plaintiff has severe impairments, which include bipolar schizoaffective disorder, anxiety disorder, posttraumatic stress disorder ("PTSD"), and degenerative changes of the cervical spine. (Admin. Tr. at 19); *see also* 20 C.F.R.

404.1520(c). Meanwhile, she found that Plaintiff's foot-related ailments, allergies, and levoscoliosis could not be considered severe. (Admin. Tr. at 20).

Third, the ALJ held that Plaintiff does not have an impairment or combination of impairments that "meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526)." (*Id.* at 21). Specifically, she determined that Plaintiff does not meet listings 1.04 ("Disorders of the spine"), 12.03 ("Schizophrenia spectrum and other psychotic disorders"), 12.06 ("Anxiety and obsessive-compulsive disorders"), or 12.15 ("Trauma- and stressor-related disorders"). (Admin. Tr. at 21–22); *see also* 20 C.F.R. § Pt. 404, Subpt. P, App. 1 (effective 9/29/2016 to 04/01/2021).[3]

Before moving to step four, the ALJ determined Plaintiff's residual functioning capacity ("RFC"):

> After careful consideration of the entire record, the undersigned finds that the claimant has the [RFC] to perform medium work as defined in 20 CFR 404.1567(c) except the claimant can occasionally climb stairs and ramps but can never climb ladders, ropes, or scaffolds. The claimant can frequently balance, stoop, kneel, crouch, and crawl. The claimant can frequently reach with her right non-dominant upper extremity. The claimant can understand, remember, and carry out short and simple instructions in a non-production paced setting. The claimant can perform low-stress work defined as requiring only occasional work-related decisions and involving only occasional changes in the work setting. The claimant can tolerate occasional interaction with coworkers and supervisors, but can have no customer service interaction with the public. The claimant cannot work at unprotected heights or around moving mechanical parts and cannot operate a motorized vehicle in the workplace.

---

[3] All three listings related to mental health require that Plaintiff satisfy criteria in paragraphs A, B, and C of each listing. (Admin. Tr. at 21); *see also* 20 C.F.R. § Pt. 404, Subpt. P, App. 1. Paragraph B of the listings provides the functional criteria for an ALJ to assess and requires that a claimant have a mental disorder than either results in an "extreme" limitation of one or a "marked" limitation of two of the four areas of function. 20 C.F.R. § Pt. 404, Subpt. P, App. 1. The four areas of function are: 1) "understand, remember, or apply information;" 2) "interact with others;" 3) "concentrate, persist, or maintain pace;" and 4) "adapt or manage oneself." *Id.* The ALJ determined that Plaintiff has a mild limitation with respect to the first area of function, a marked limitation in the second area, and moderate limitations in the third and fourth areas. (Admin. Tr. at 21–22).

(Admin. Tr. at 23); *see also* 20 C.F.R. §§ 404.1545, 404.1529. In making this determination, the ALJ first evaluated whether Plaintiff suffers from an underlying medical impairment, and if so, evaluated the "intensity, persistence, and limiting effects" of the symptoms to "determine the extent to which they limit the claimant's work-related activities." (Admin. Tr. at 23); *see also* 20 C.F.R. § 404.1529(a), (c)(1). The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that her statements regarding the intensity, persistence, and limiting effects "are not entirely consistent" with the medical and other evidence in the record. (Admin. Tr. at 24). To come to this conclusion, the ALJ evaluated many of Plaintiff's individual doctor's visits, in addition to Social Security Administration-ordered consultative exams and reviews of the medical record. (*Id.* at 24–27).

At the fourth step, the ALJ determined that Plaintiff is unable to perform any past relevant work. Lastly, based on the RFC determination and Plaintiff's age, education, and work experience, the ALJ found that jobs exist in the economy that Plaintiff could perform. (*Id.* at 32). Therefore, the ALJ held that Plaintiff is not disabled under sections 216(i) and 223(d) of the Social Security Act. (*Id.* at 33).

V.      Plaintiff's Appeal

Plaintiff requested review of the ALJ's decision by the Appeals Council. (Admin Tr. at 1). On October 18, 2021, the Appeals Council denied Plaintiff's request. (*Id.* at 1–4). Thereafter, on November 4, 2021, Plaintiff petitioned this Court for review of the decision. (ECF No. 1). The Commissioner then made the present Motion for Judgment on the Pleadings. (Def.'s Mot.).

## STANDARD OF REVIEW

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Agolli v. Comm'r of Soc. Sec.*, No. 20-CV-5369 (MKB), 2023 WL 6050096, at *3 (E.D.N.Y. Sept. 15, 2023) (quoting *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005)). "Courts review de novo whether the correct legal principles were applied and whether the legal conclusions made by the ALJ were based on those principles." *Flores v. Comm'r of Soc. Sec.*, 644 F. Supp. 3d 53, 57 (S.D.N.Y. 2022) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)). If the correct legal standards were applied, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quotations omitted). "Substantial evidence" is defined as "more than a mere scintilla" and includes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014). On the other hand, if the court is "unable to fathom the ALJ's rationale in relation to evidence in the record," it will not "hesitate to remand for further findings or a clearer explanation for the decision." *Chichoki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) (quoting *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)).

**DISCUSSION**

On appeal, Plaintiff asserts that her disability benefits were improperly denied because she is disabled and unable to work. (*See generally* Compl.; *see also* ECF No. 18). Defendant, meanwhile, argues that the ALJ properly evaluated Plaintiff's limitations, considered the listings, evaluated Plaintiff's RFC, and found Plaintiff capable of performing certain types of work. (*See generally* ECF No. 13-1). The Court finds that substantial evidence did not support the ALJ's RFC determination and the ALJ failed to adequately develop the medical record, and therefore remand is warranted.

I.      The RFC Was Not Supported by Substantial Evidence

Here, the ALJ followed the correct legal procedures in making her determination.[4] The issue is thus whether the finding was supported by substantial evidence. In this case, the RFC was not supported by substantial evidence because the ALJ cherry-picked medical records to support her finding, improperly dismissed treatment records and a medical opinion, and relied on stale evidence.

"To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, No. 507-CV-0803 (LEK) (VEB), 2009 WL 1940539, at *8 (N.D.N.Y. July 6, 2009) (citing 20 C.F.R. §§ 404.1545(b)–(e)), *aff'd* 370 F. App'x 231 (2d Cir. 2010) (summary order). More specifically, an ALJ must first ascertain whether underlying medical impairments exist that "could reasonably be expected to produce" the plaintiff's symptoms, and if so then the ALJ must "evaluate

---

[4] As noted above, an ALJ must follow a five-step procedure to determine whether a claimant is eligible for disability insurance benefits. 20 C.F.R. § 404.1520(a)(4)(i)–(v). Here, the ALJ properly moved through each step of the process.

the intensity and persistence" of the plaintiff's symptoms in light of all medical and nonmedical sources. 20 C.F.R. §§ 404.1545(a)(3), (c)(3), (e); 404.1529(a), (c)(1). For claims brought after March 27, 2017, an ALJ does "not defer or give any specific evidentiary weight" to any medical opinion. 20 C.F.R. § 404.1520c(a). Instead, the ALJ evaluates five factors: (1) supportability, (2) consistency, (3) the relationship of the medical source with the claimant, (4) the medical source's specialization, and (5) other factors, including the medical source's familiarity with other evidence and the Social Security Administration. 20 C.F.R. § 404.1520c(c). The most important factors are supportability and consistency. 20 C.F.R. § 404.1520c(a).

Here, in assessing Plaintiff's mental RFC, the ALJ determined that Plaintiff 1) can perform low-stress work, which requires "only occasional work-related decisions and involving only occasional changes in the work setting;" 2) can tolerate occasional interaction with coworkers and supervisors but cannot interact with customers; and 3) cannot work at unprotected heights, around moving mechanical parts, or with motorized vehicles.[5] (Admin. Tr. at 23). In reaching these conclusions, the ALJ relied almost exclusively on CCM's medical records, while finding that Ahava's medical records were unpersuasive because they were "unsupported by and inconsistent with the record." (*Id.*

---

[5] In connection with Plaintiff's physical RFC, the ALJ determined that Plaintiff is capable of medium work with some additional physical restrictions. (Admin. Tr. at 23). The Court finds that this is supported by substantial evidence because the ALJ reviewed the records related to Plaintiff's physical impairments, accounted for Plaintiff's subjective complaints, and made a determination that was supported by and consistent with this evidence. Specifically, the ALJ relied on an MRI from December 2016, which revealed various spinal degenerative issues. (*Id.* at 29). The ALJ also found the internal medicine consultation with Dr. Weiss on November 19, 2019, to be generally persuasive because Dr. Weiss' notes were consistent with and supported by the record overall. (*Id.*). The ALJ noted that Dr. Weiss reported that Plaintiff had no limitations, but limited Plaintiff's work capability to medium exertional level due to the degenerative changes noted on the MRI. (*Id.*; *see also id.* at 460–61). Further, the ALJ considered Plaintiff's subjective complaints of pain that she made at her telephone hearing. (*Id.* at 30–31) Therefore, the physical RFC was adequately supported because the ALJ considered the relevant medical and nonmedical evidence and explained the consistency and supportability factors.

at 28). The ALJ also found that Dr. Miller's consultation was persuasive and that agency psychological consultants Dr. Gagan's and Dr. Dambrocia's reviews of the records were generally persuasive, except for the portions related to Plaintiff's ability to interact with others. (*Id.* at 27).

A.   The ALJ Impermissibly Cherry-Picked CCM's Treatment Records to Suit the RFC Determination

"Courts frequently remand an ALJ's decision when it ignores or mischaracterizes medical evidence or cherry-picks evidence that supports [their] RFC determination while ignoring other evidence to the contrary." *Ting v. Comm'r of Soc. Sec.*, No. 23-CV-1241 (PKC), 2024 WL 245259, at *9 (E.D.N.Y. Jan. 23, 2024) (quoting *Jackson v. Kijakazi*, 588 F. Supp. 3d 558, 585 (S.D.N.Y. 2022)); *see also Jones v. Saul*, No. 19 Civ. 5542 (LGS) (BCM), 2020 WL 5775525, at *12 (S.D.N.Y. Sept. 11, 2020) ("an ALJ may not 'cherry-pick' medical opinions, or selectively cite treating notes or diagnostic imaging that support the ALJ's own view while ignoring opinions and evidence that do not") (citations omitted), *adopted by* 2020 WL 5775195 (Sept. 28, 2020).

The ALJ found CCM's notes relevant and consistent with the record overall. (Admin. Tr. 24–29). At the same time, the ALJ failed to address the more severe symptoms that were noted throughout CCM's records, which showed a larger picture of Plaintiff's mental health and conformed with the potential severity of Plaintiff's mental health indicated in other parts of the record. For example, in relaying Plaintiff's first visit to CCM on July 25, 2019, the ALJ writes that Plaintiff was described as "alert, with intact orientation, appropriate affect, euthymic mood, good grooming, good eye contact, logical and coherent speech, goal directed thought processes, intact memory, normal thought content, no evidence of hallucinations, cooperative behavior, good judgment, good

impulse control, and an ability to focus." (*Id.* at 24). In addition to these positive notations, however, the actual record from that first visit diagnoses Plaintiff with social phobia, generalized anxiety disorder, and major depressive disorder. (*Id.* at 543). Although the ALJ does mention Plaintiff's depression and anxiety in her decision, she never discusses the diagnosis of social phobia. Moreover, the treatment record from Plaintiff's first visit to CCM also details her everyday symptoms and not just how she appeared at the appointment. For instance, Plaintiff described that she "just want[s] to stay at home and sleep," gets "stressed out by general population," does not want to be in public places, feels like she is always targeted by people, and gets panic attacks, shaking, dizziness, and vomiting from social exposure. (*Id.* at 543). None of these symptoms are captured in the ALJ's decision. Rather, the ALJ seemingly focused on Plaintiff's mental state in front of the therapist, and not in the everyday world. This is impermissible. *See Loucks v. Kijakazi*, No. 21-1749, 2022 WL 2189293, at *2 (2d Cir. 2022) (summary order) (finding it an error for the ALJ to focus on the fact that the claimant's "mental status examinations were largely normal" because the examinations "analyze the patient's mental state only at the time of the examination and do not consider symptoms the patient may experience outside of that brief period of time").

Throughout her decision, the ALJ continued to mention symptoms within CCM's records that support her finding, while disregarding others. (*Compare* Admin. Tr. at 24 (the ALJ describes Plaintiff's August 12, 2019, and August 22, 2019, examinations as revealing an ability to focus and to see different perspectives, fair motivation, and moderate or high degree of compliance with treatment) *with id.* at 534, 537 (in addition to those comments, the actual treatment notes from those dates reflect Plaintiff's

depression, how she does not want to leave bed or her apartment, and her inability to handle people or get a job)). Likewise, the ALJ chose to describe particular visits that supported the RFC, while disregarding CCM treatment records with more negative notes. For example, in sessions dated October 21, October 31, November 5, and November 12, 2019, the therapist noted how Plaintiff described her inability to meet her own needs because she was unable to get a job for various reasons, such as poor time management skills or an inability to focus. (*Id.* at 508–15). These visits, and symptoms, however, were never discussed by the ALJ. While the ALJ is not expected to describe *every* doctor's visit, cherry-picking to suit her own needs in unacceptable. *See Balotti v. Comm'r of Soc. Sec.*, 605 F. Supp. 3d 610, 620 (S.D.N.Y. 2022) ("Although an ALJ need not recite every piece of evidence that contributed to her decision, *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010), she 'cannot pick and choose evidence the record that supports [her] conclusions.'") (quoting *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004)). Therefore, the ALJ impermissibly selected symptoms and records to support her RFC determination.

B.    The ALJ Improperly Discredited the Ahava Records and Related Medical Opinion

By heavily relying on CCM and Dr. Miller's records and disregarding the records from Ahava, the ALJ ignored indicators pointing to Plaintiff's worsening condition and found the Ahava treatment records to be inconsistent and unsupported by the record overall. Plaintiff received treatment at CCM from July 25, 2019, through March 6, 2020. (Admin. Tr. at 495–560). Dr. Miller's consultation occurred on November 16, 2019. (*Id.* at 561–600). The CCM records reflect some progress, and on February 14, 2020, Mr. Perron noted that Plaintiff was doing well and could be ready for "an education program."

(*Id.* at 476–77). Subsequently, on September 29, 2020, approximately six months after ending treatment with CCM, Plaintiff began treatment at Ahava. (*Id.* at 562). At both the telephone hearing before the ALJ on August 6, 2020, and upon intake at Ahava, Plaintiff stated that she stopped working with CCM because she got in a fight with her therapist, who she believed to be lying to her. (*Id.* at 47, 567).

At Ahava, in addition to positive observations about Plaintiff's appearance and attitude at the therapy sessions, such as good grooming and focused attention, Plaintiff was diagnosed with schizophrenia and noted to have auditory hallucinations, as well as paranoid and anxious thoughts. (*Id.* at 569–600). Further, Dr. Mohammad submitted two medical opinions: a letter stating that Plaintiff was unable to work due to her diagnoses and a "Mental Residual Functional Capacity Assessment" that rated Plaintiff's ability to perform job functions as either markedly or extremely limited. (*Id.* at 575, 582–85). The ALJ, however, largely discredited the Ahava treatment notes, the schizophrenia diagnosis, and Dr. Mohammad's medical opinion because Dr. Mohammad only saw Plaintiff for a short time and his assessment was inconsistent with and unsupported by the rest of the record. (*Id.* at 28).

The ALJ's disregard for Dr. Mohammad's diagnosis and opinion is in error for a variety of reasons. First, the Administrative Transcript only includes approximately six months of treatment at CCM, followed by four months of treatment from Ahava. The lengths of treatment from both centers are similar, so there is no reason to rely on one source over the other. Next, the ALJ noted that many descriptions of how Plaintiff appeared for therapy sessions, such as her ability to focus and good grooming, were consistent between Ahava's, CCM's, and Dr. Miller's notes. (*Id.* at 28). The ALJ, however,

compares the Ahava records to her cherry-picked CCM treatment records, while simultaneously ignoring CCM treatment records that capture a larger, and more negative, picture of Plaintiff's mental health. Without taking the previous, negative notes from CCM into consideration, the ALJ easily discredits Ahava's more severe diagnoses and opinions on Plaintiff's limitations as lacking consistency and support. This narrow analysis fails to consider that over time, especially without the help of trusted and continued treatment, Plaintiff's mental health could have deteriorated. *See Anderson v. Kijakazi*, No. 20 Civ. 6492 (JPO) (OTW), 2022 WL 938115, at *8 (S.D.N.Y. Mar. 3, 2022) (where the medical record showed that the plaintiff's mental wellbeing fluctuated over time, it was an error for an ALJ to discredit an entire medical opinion based on merely parts of that medical opinion); *see also Almonte v. Comm'r of Soc. Sec.*, No. 21-CV-3091 (PKC), 2022 WL 4451042, at *10 (E.D.N.Y. Sept. 23, 2022) (remanding to the Commissioner when an ALJ's decision relied on evidence that was between fifteen and eleven months old and there was additional evidence that the plaintiff's condition had deteriorated).

Moreover, "[i]n the context of mental illness, the Second Circuit has cautioned against relying on isolated mental status exams to draw conclusions about a patient's abilities." *Faure v. Comm'r of Soc. Sec.*, No. 22 Civ. 1571 (KHP), 2023 WL 5013282, at *12 (S.D.N.Y. Aug. 7, 2023) (citing *Loucks*, 2022 WL 2189293, at *2). While Mr. Perron's evaluation in February 2020, which reflects significant improvement, can by no means be ignored, it must also not be viewed in a vacuum. The ALJ fails to account for the fact that Plaintiff's symptoms could have worsened by the time she sought treatment at Ahava, which was six months after ending treatment with CCM and ten months after Dr. Miller's consultation. The ALJ states, "During the course of her treatment at CCM, the claimant

never complained of any visual or auditory hallucinations. Moreover, none were evident on mental status examinations. The claimant only started to complain of auditory hallucinations in September 2020, when she first sought treatment with Dr. Mohammed [sic]." (Admin. Tr. at 25). But in November 2019, Dr. Miller noted:

> Thought disorder symptoms: Possible auditory hallucinations. She hears a sound that could be somebody trying to open her front door. It may be an auditory hallucination or it could be that somebody really is trying to break into her home. Paranoid ideation causing her to think that there is always someone in the hallway who might hurt her and that people are talking about her.

(*Id.* at 455). Plaintiff's complaints of auditory hallucinations with Dr. Mohammad were therefore not the first time they were mentioned in the medical record. The apparent increase in hallucinations described by Dr. Mohammad could be indicative of the passage of time and a deterioration of Plaintiff's mental health. "Cycles of improvement and debilitating symptoms [of mental illness] are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019) (alterations in the original) (quotation omitted). Instead of verifying Ahava's records, the ALJ simply discredits them. The ALJ could have contacted Dr. Mohammad or Ms. Taub directly, set up another consultative exam with Plaintiff, or asked Plaintiff follow-up questions directly. *See* 20 C.F.R. § 404.1520b(b)(2)(i)–(iv). Even more, nonmedical evidence in the record is consistent with the Ahava treatment records, but it is unclear whether it was considered

by the ALJ.[6] Accordingly, the ALJ erred by discrediting the Ahava treatment records and failing to consider the larger picture of Plaintiff's mental health.

C.   The ALJ Relied on Stale Records by Finding the Psychological Consultants' Opinions Generally Persuasive

"It is an error for an ALJ not to account for the fact that medical opinions are stale." *Wright v. Kijakazi*, No. 22-CV-3310 (PKC), 2023 WL 6308043, at *6 (E.D.N.Y. Sept. 28, 2023) (quotation omitted). A medical opinion is not stale merely because of its age, but "may be stale if it does not account for the claimant's deteriorating condition." *Rodriguez v. Comm'r of Soc. Sec.*, No. 20 Civ. 3687 (VSB) (RWL), 2021 WL 4200872, at *18 (S.D.N.Y. Aug. 19, 2021) (collecting cases); *see also Jones v. Comm'r of Soc. Sec.*, No. 10-CV-5831 (RJD), 2012 WL 3637450, at *1–2 (E.D.N.Y. Aug. 22, 2012) (finding that the ALJ erred by relying on a medical opinion in part because it "was 1.5 years stale" and "did not account for her deteriorating condition").

The opinions from the psychological consultants Drs. Gagan and Dambrocia are based on stale medical records and cannot be considered substantial evidence. "[M]edical source opinions that are conclusory, stale, and based on an incomplete medical record may not be substantial evidence to support an ALJ finding." *Camille v. Colvin*, 104 F. Supp. 3d 329, 343–44 (W.D.N.Y. 2015), *aff'd* 652 F. App'x 25 (2d Cir. 2016). Here, Drs. Gagan and Dambrocia based their opinions on incomplete medical records that were either missing both CCM and Ahava's records or just missing Ahava's

---

[6] Plaintiff's former employer, Gretchen Newworth, who employed Plaintiff as a teacher's aide at a daycare, submitted two letters in support of Plaintiff's benefits eligibility. (Admin. Tr. at 195, 232). In the letters, Ms. Newworth explains how she was forced to let Plaintiff go because she was "unable to interact appropriately with other individuals," "had great difficulty completing the task at hand," and her paranoia caused dangerous situations in the workplace. (*Id.* at 195–96, 232–34).

records. (Admin. Tr. at 84–112). Thus, these opinions are stale and are not substantial evidence, and the ALJ's finding that these opinions were in part persuasive was in error.

In sum, the ALJ's RFC determination is not supported by substantial evidence because the ALJ relied on a cherry-picked record, improperly discredited the Ahava treatment notes and opinions, and relied on stale evidence. Therefore, remand is appropriate.

II.    The Administrative Record was Insufficiently Developed

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citation omitted). An ALJ has a "doubly heightened duty to develop the record" when a claimant proceeds pro se and alleges numerous mental impairments. *Maldonado v. Comm'r of Soc. Sec.*, 524 F. Supp. 3d 183, 194 (S.D.N.Y. 2021) (quotation omitted); *see also Moran v. Astrue*, 569 F.3d 108, 113 (2d Cir. 2009) (quotation omitted) (when a claimant proceeds pro se, "the ALJ's duties are heightened"); *Perez v. Comm'r of Social Security*, 2023 WL 6308051 (E.D.N.Y. Sept. 28, 2023) (an ALJ's duty is "heightened when a claimant asserts a mental impairment") (quotations omitted). To that end, the ALJ "must adequately protect a *pro se* claimant's rights by ensuring that all of the relevant facts are sufficiently developed and considered and by scrupulously and conscientiously prob[ing] into, inquir[ing] of, and explor[ing] for all the relevant facts." *Moran*, 569 F.3d at 113. (quotations omitted). This includes "the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Maldonado*, 524 F. Supp. 3d at 194 (quotations omitted).

Here, the ALJ failed to meet this doubly heightened standard. First, although the ALJ considered Plaintiff's subjective statements from the telephone hearing to evaluate the intensity and persistency of her symptoms, the ALJ failed to make any inquiry, either directly to Plaintiff or to her doctors, about Plaintiff's mental health. At the telephone hearing, the ALJ directly inquired about Plaintiff's physical impairments, her day-to-day, and what prevented her from working, but did not ask any specific questions about Plaintiff's mental impairments. (Admin. Tr. 50–51, 55). At the time, however, the ALJ did not have any of Plaintiff's mental health records in front of her. (*Id.* at 47). Subsequently, the ALJ received the missing records and entered them into the record. (*Id.* at 268–86). Although this closed significant gaps in the record, the ALJ fell short of her duty by failing to make any inquiries about the new records so as to understand the inconsistencies and by discrediting the only medical opinion provided. *See Angelica P. v. Comm'r of Soc. Sec.*, 2023 WL 2366913, at *6 (S.D.N.Y. Mar. 6, 2023) ("Given the conflicts in the medical evidence, and in light of the ALJ's decision to grant none of the medical opinions full weight, the record calls for enhancement through inquiries to the treating physicians or consultants that might shed light on the import of their opinions and the conflicts the ALJ identified") (quotation omitted). Accordingly, the lack of questioning about the impairments to a pro se plaintiff, combined with the fact that no probing into Plaintiff's mental health occurred after the ALJ received the medical records is sufficient to warrant remand. *See Maldonado*, 524 F. Supp. 3d 183, 195.

Dovetailing this first discrepancy, as part of the obligation to develop a medical record, "an ALJ must attempt to obtain medical opinions—not just records—from a claimant's treating physicians." *Skartados v. Comm'r of Soc. Sec.*, No. 20-CV-3909

(PKC), 2022 WL 409701, at *4 (E.D.N.Y. Feb. 10, 2022) (citations omitted). "Medical opinions from treating physicians are critical because, beyond simply diagnosing the patient's impairment, they relate the impairment to the patient's functional capacity." *Id.* (citing *Guillen v. Berryhill*, 647 F. App'x 107, 109 (2d Cir. 2017)). Here, the only medical opinion in the record is from Dr. Mohammad. The ALJ, however, as discussed above, discredits the opinion in its entirety by comparing it to older, cherry-picked medical records and without verifying its integrity. Rather than merely discrediting apparent contradictions, the ALJ should have sought additional evidence. *See, e.g.*, *Quijano v. Comm'r of Soc. Sec.*, No. 20-CV-3363 (PKC), 2022 WL 955144, at *6 (E.D.N.Y. Mar. 30, 2022) (the ALJ adequately developed the record when they "sought and obtained additional evidence to resolve the contradiction" arising from the medical evidence). The ALJ was duty-bound to obtain an opinion about Plaintiff's work-related mental limitations from a treating physician. *See Vilma S., Plaintiff, v. Comm'r of Soc. Sec.*, No. 23 Civ. 00025 (GRJ), 2024 WL 515259, at *6 (S.D.N.Y. Feb 9, 2024) (citation omitted) (when the ALJ "did not fully credit any of the medical opinion evidence regarding [the plaintiff's] mental limitations," the ALJ "erred by failing to obtain an assessment of [the plaintiff's] work-related mental limitations" from the treating physician). Thus, the ALJ failed to adequately the record.

***

Therefore, because the RFC determination was not supported by substantial evidence and the administrative record was not sufficiently developed, remand is warranted.

## CONCLUSION

For the reasons set forth above, the Court denies Defendant's Motion for Judgment on the Pleadings. This case is remanded for further proceedings consistent with this Memorandum & Order. The Clerk of the Court is respectfully requested to serve a copy of this Memorandum and Order on Plaintiff by mail, note service on the docket, and close this case.

SO ORDERED.

Hon. Ramón E. Reyes, Jr.

Digitally signed by Hon. Ramón E. Reyes, Jr.
Date: 2024.03.14 18:55:45 -04'00'

RAMÓN E. REYES, JR.
United States District Judge

Dated: March 14, 2024
         Brooklyn, NY

24